Next case on the docket is in re the Marriage of Scheibel. Correct. All right. Clause number 5-14-0440. And Mr. Fahrenkamp? Yes, sir. You may proceed whenever you're ready. We do these cases just like this appeal. And sometimes as lawyers we focus on it as being a matter of law. But they're all about people. And in this case, the most important two people in the case were Julianne and Jace, who are the children of the Scheibels. Julianne and Jace, by all record, by all measure, at the time of trial, were doing very well. They were doing great. Surprisingly, astonishingly great. And all the evidence supports that. As a matter of fact, it's defined by the court that they're doing well. They are honor students. They are adaptive and integrated well into the community. And there is no health issue. There is no issue with either one of the children as far as their mental state. Now, they achieved this after their parents had been divorced. And the threshold or baseline of how those parents got along was established in the original judgment. And that baseline wasn't a pretty one. They're imperfect parents by all measure. In fact, at the time, the guardian ad litem said that there was great bitterness and hostility between them. And due to this hostility, there have been attempts on Cheryl, that's my client, the mother's part, to alienate the children. At the same time, the father also complained that the mother was trying to prevent them from speaking to him in public functions and interfering with his visitation. That's the baseline. That's the original judgment. And, in fact, at that time, based on that, the court gave custody, primary custody, to the mother, my client. A few years later, there was a petition to modify, and the basis for it is the mother is not getting along with the father. The exact same things that were findings in the original judgment. Now, the fact that these children are prospering and flourishing is a factor I'll deal with later. But the factor I think that was the most critical was the one that these parents, imperfect as they are, established a baseline. And when it comes time to review it, the trial court is bound by the rules given to us by the legislature. The legislature created this standard that says that there has to be a substantial change in circumstances, and that substantial change has to affect the children. In this case, if the baseline had been Ozzie and Harriet or the Partridge family or Donna Reed walking down the staircase with gloves on her hands, then this current situation would certainly be changed. Fortunately, you're talking to people who remember Donna Reed walking down the staircase with gloves on her hands. But that baseline was, if that was the baseline, then certainly there's a change in circumstances. But even in the extreme, let's say that these parents are imperfect or crazy, but that's that baseline. And let's say they are imperfect and crazy now. There still has to be a change in circumstances. And in this case, the evidence was consistent that what was going on at the time of trial was the same thing that was existing at the time of the original judgment. And the concern we have is basically what the trial judge did was just treat it like an initial determination instead of taking the statutory requirements. And by doing that, he treated it as though if this were an initial hearing, here's what I would do. The description of how the children are doing is the second part of it, and that is they were doing great. There's no connection, no nexus between any dysfunction on the part of the parents communicating and connecting it with the children and how they're doing. The standard is so high that what they're achieving now that there's not much more they can do. They're high performance in school, extracurricular activities. So the kids are doing well. The case that where it comes in where you'll have like Nolte where there's really a substandard performance by a mother, and the father seeks to change custody, even though the mother made horrible decisions. The trial court was reversed because they didn't make a connection between what was alleged to be the problem and the effect on the children. There was no effect on the children. This is exactly that case, if not better, because in this case, the differences between the parents and what they're doing is just a continuation of what existed before. The trial court found as reasons for changing custody was that the mother would adhere to the court order. She wouldn't deviate from the court order. So she was being sanctioned or found not to perform as she should as a mother because she actually did what the court order said. You know, we do this all the time, and we say to people, if you can work things out, that's great, but when you do not agree, follow the court order. Well, the court actually cited that as one of the reasons for changing custody. The mother actually didn't deviate from the court order. The others would be that... Well, I mean, part of what the court was talking about there would be, like, a change for visitation, right? Correct. If something came up and the father said, can I have the kids on a special day for something special, she'd say no. I mean, I don't know that that's punishing somebody for following the court order. I mean, the way I read the court's oral rulings, he's talking about not being cooperative in the raising of the children. And that's... I agree with what the court said. You see what I'm saying? But it's an odd situation for us to be in because what we're saying is she is following the court order because of things that he does. And what we hear, that's part of the story. The other part is where he pokes and prods her. These people know I push and touch buttons. He would bring the police to exchanges when it wasn't necessary. And there was no arrest resulting. There was no DCFS reporting results. But he would do it routinely, and that created a resentment on the part of the mother, which, again, these people are knuckleheads. I mean, we are not dealing with the highest standard of parenting, but who are we to judge at this point if they're within that causeway? If it is, they're knuckleheads, but they were knuckleheads before. That's exactly right. So there's no change in circumstances. That's part one. And part two is that being knuckleheads, the children not only survived it, it didn't change their situation. They flourished. But the father said they're doing extraordinarily well. They're doing very well. Great is the word he used. So that's the first part is the knucklehead then, knucklehead now. But the second part is no effect on the kids. And that's why we believe that the trial court didn't apply the standard that's required by 610 or by the Nolte case or by the other cases that describe what we should be doing. You argued in your brief that the trial court didn't make sufficient findings. Correct. Are you still making that argument? Well, I mean, I know we're talking about the oral, the difference between oral findings and the findings of the oral. But the findings that were missing were the ones that were essential, and the finding would be that there was an effect on the children. And so that's part of it. So I'm saying, yeah, it wasn't sufficient because it should have said, here's how the children are impacted by it, and this is how it affected them negatively. Because the substantial change has to have some adverse effect on the children to change what's going on. In this case, the children were doing great. So I'm sticking by that to that extent. Wasn't there a GAL report? There was. There was a GAL report. There were two. There was one, the baseline one, the first time, and there's one the second time. And the GAL report pretty much found that the father had done some things that were provocative to the mother and that the mother had done some things back and had recommended the father. However, that recommendation alone, by the testimony of the guardian advisor, did not take into account, and he didn't even set the legal standard. All he was doing was straight-up best interest. And this is not a best interest standard yet until we get to the change standard. And so if substantial change wasn't shown, if there's no substantial change shown, and there's no effect on the children, so we don't get to that underlying best interest analysis because they haven't sustained that initial threshold. So I think Jim Drazen, the guardian of Lydo, specifically said, no, I did not make my recommendations in light of the standard for a modification. Thank you. All right. Thank you, counsel. Mr. Blood. Thank you, Your Honor. May it please the court. For the record, my name is Curtis Blood. I represent Terry Scheibel, the father. And I disagree with some of the things I heard. I definitely do. My plan was to start out on the standard of review and then talk about a few facts and then go into the issues because there's only two ahead of both. But I think I'd rather address some of the things I just heard, if that's all right. Bringing police to exchanges when it was not necessary. There was no evidence of that. No evidence of that at all. The evidence was that the daughter was not being brought to her softball game. One of the children was not being brought to his sports activities that he was signed up for. And the mother would not bring the child until the father procured a court order. As far as the police being necessary, there was one event where the police came to the house because the mother refused to allow the father to take the child on an exchange. Because the mother told the police that the children were afraid of the father. So the police said, well, let's talk to the kids. Kids, are you afraid of your father? We're not afraid of our father. Well, the man can go. Can they go? That's how the officer got the kids out of her house. An officer testified to another event. But the idea that the police were not necessary shouldn't even be in here. No evidence of that at all. No evidence of a single event where the police were brought for nothing. Always a problem over there. Constant problems over there. The biggest problem over there is that the mother, and she admits this, will not talk to the father. Now, I don't mean that she has a little trouble talking to the father. I don't mean she's uncomfortable talking to the father. I mean the children get exchanged for visitation, and one of them, the son, has had a tonsillectomy. He's had his adenoids out. The kid's dropped off at the motor mart for visitation, and what's wrong with you? Do you need help? Getting to the car, they helped him to the car. What's the matter? Couldn't talk. His sister explained, he just had his tonsils and adenoids out. Well, is he on any medication? Is there anything that we need to do? Hadn't heard a word out. Hadn't heard a word from the mother. There's another one where the daughter had a molar removed, had stitches. She was dropped off for visitation, not a word of it, and I guess she didn't mention it either, until the mother didn't show up to pick up the daughter on the next exchange. And the daughter says, what am I going to do? I've got to get these stitches out tomorrow. I have a doctor's appointment. Father took her. Well, father took her, his new wife took her, they took the brother with them. So all four of them went to the doctor's office. Quite a scene in the doctor's office, and we explain this in our brief, what happened there. Apparently, that mole was biopsied. And the father didn't find out that that mole had been biopsied until he read the discovery for the trial of this case. Mother literally will not talk to him, will not say a word to him, just won't do it. There was nothing like this going on back in 2011, the time of the original order. The second guardian ad litem was totally misrepresented here, and pretty much ignored in the appellant's brief. The GAL writes, the kids are substantially worse over the last seven months, last few months. He's called it imperative that the court act to reduce the children's stress. So, is there a change? There's plenty of reason to say that there is. The court, he didn't say the children have been affected, he said how they've been affected. And that's certainly ought to do it. That's certainly ought to do it for change, both for sufficiency of the evidence and for defining. Now, I'd like to back up and talk about that standard of review. The way it's phrased in a change of custody case is that this court will leave the judgment undisturbed unless there is an abuse of discretion or the decision is against the manifest weight of the evidence. It's stated as an OR standard. But those are both very deferential standards. Now, about findings. Whether the findings satisfy the statute, that's a question of law. But what this court would do if the findings were insufficient is entirely different from what the court should do if the evidence is insufficient. If it's merely a case of the findings being insufficient, this court, in the Vollmer case, allowed the change of custody to persist while the circuit court made new findings. And that's the way, I mean, if this court, I can't imagine, just can't imagine nine pages of oral findings and four pages of written findings would not be enough. I mean, you know everything the court had for breakfast. If it isn't enough, what ought to happen is it ought to go back for more findings while the children make good their escape. On that standard of review, Mr. Blood, I mean, abuse of discretion and manifest weight are two different standards of review. Do you think what the case law is saying is on the court's factual determinations, those are reviewed to determine whether they're against the manifest weight of the evidence? And then on the court's decision about custody, that's abuse of discretion. Is that what that means? I mean, when you combine two standards of review into the same sentence, that's kind of troubling as to what it means. I thought about that. It is, but I don't disagree with what you said. Because we usually review factual findings on manifest weight and then make determinations on an actual ruling sometimes based on abuse of discretion. So I'm wondering, is that the way you read that standard of review? Well, the piece I've made in my own mind is that if the circuit court says something about facts, that's not right. You can go to the evidence and say, well, there's no evidence of that. It's not A said, B said, I wouldn't be. It's something that nobody said. Well, then that's against the manifest weight. That's the piece that I've made. Because we could say, you know, we don't think the trial judge, we don't think any of his findings were against the manifest weight. However, on those facts, he abused his discretion by changing custody. Right? Absolutely. Okay. I'm sorry. Go ahead. Oh, no, this is great. So finally, I'm going to discuss the case. The father and his new wife, they both said, I'm still on the change, on what changed. They both said that something changed in the mother when the father remarried. Well, the way the father put it, I don't think it's good grammar, but he said, she doubled down. I think it should be doubled down, but he said she doubled down. He said it twice. When I got remarried, she doubled down. His wife echoed his sentiments. It's evidence. I mean, it's evidence the trial court was entitled to consider, and I did. The findings, the findings, there is no such thing as perfect findings. I think that you could just read the cases and what they say the findings need to be and just maybe put those on a tape recorder and play them back and write them down. Would you have better than you had in this case? Would you really? Were you everything that the judge was thinking? You know, all these things that the mother did that bothered the judge, the judge wrote about, like reading the interrogatory answers, the custody interrogatories to the kids. That troubled the judge a great deal. He mentioned it more than once in his findings. The kids, I know you saw this, but I'm going to mention it anyway. It was important to the judge. The kids came home from school one night, and Mom had changed the locks on the house. You're out of here. Fortunately, everybody lives in Edwardsville. They just go across town to Dad's house. But they were out for weeks. Mom just changed the locks. And going back to change, too, is this kind of stuff wasn't happening before the father remarried, but it's happening now. These are strange events. These aren't normal things to have happen. The GAO, I'm bouncing around a little, but these are important. They're all important things. The second GAO wrote that the mother was consumed by her hatred of the father. And the children no longer wanted to live where neither their interests nor their wishes were considered. And when you use the word consumed like that, that means used up. That means if you've got a fireplace and the wood is consumed, the fire goes out. If you're driving down the street and your fuel is consumed, you have to get off and walk. The mother's ability to look out for her children, to look out for their interests, to take their wishes into consideration, is consumed. She doesn't have it. That's what the GAO said. And that's kind of the facts that we're getting, too. It's terribly wrong. It's terribly wrong. You usually get cases in this courtroom where it's kind of a beauty contest. The circuit court's made a decision and kind of stuck with it. You can't see room. But it's usually fairly close. And a lot of times what sways it is where the custody has been persists. This is an odd case. It's a very strange case where there's a lot more going on here. There's a lot of trouble in the mother's house. And the judge understood it. And he did something about it. If you were to, you don't have time to read all these transcripts, but if you were to take this one, start at about page 30 of the trial transcript, and just start reading, you wonder how the trial court avoids pulling his hair out, not to mention her own lawyer, who said at one point, I want you to stop. I'm asking you what time of day, and you're telling me how to make a watch. You can't get a straight answer out of her. Accusations coming out of her mouth, boom, boom, unsubstantiated, unfollowed through. She's an exasperating person. Even on paper, she's an exasperating person. And you wonder how the kids do it. The kids do seem to be doing well in school, but you've got to wonder. I mean, this is how people end up cutting themselves. This is not right. There's something needed to be done here. And the GAL said it's imperative that this court do something to protect these kids. Imperative. Circuit court read that. It was stipulated into evidence. Circuit court read it. Circuit court understood what these kids were going through over there, and they threw themselves in front of the train and stopped it. It needed to be stopped. It needed it very badly. And I don't know what's been done over there. It's a terrible situation. But the court's done everything. And what he did was for the best interest of these children. These findings are sufficient, but change is definitely there. There's nothing wrong with this judgment and this court's first advice to these children. And we'd ask that the court confirm it. Okay. Thank you, Mr. Blake. Thank you, Mr. Farrenkamp. Mr. Ubedo. I have the pleasure of being in this case before the first judgment and on the second hearing. And I say pleasure a little bit sarcastically because it's like a lot of cases. I do a lot of divorce cases. I do a lot of custody cases at the trial level. And I can disagree with what Mr. Blood is saying. It's not uncommon to have people act a little goofy, a little crazy. And it's not the first time in court where I do tell my client who's on the stand, you're telling me how to make a watch. I just want to know the time of day. Because people are so emotionally caught up in these things. They're not perfect. And that's what we have to establish as a baseline. They have their issues. But one thing is clear, and I think that even Mr. Blood concedes this, the children are doing very well. Again, we get back to that. And we get back to a couple of other things. He suggested that this wasn't going on in the first case. I disagree 100 percent because I lived it in the first case and because the guardian ad litem repeated it in the first case, saying it's clear from all parties involved that children feel stuck in the middle. That's what the guardian ad litem says. Each of the children appear clearly bonded to both parents. However, they appear to walk on eggshells and are afraid to speak openly in front of either parent. Either parent, due to the hostile nature of dissolution action, this new wife was not new in the relationship. As a matter of fact, she's the same woman who was with him before. They said, even the guardian acknowledges, says Julianne, which is the older daughter, and the present girlfriend seemed to have a good relationship. There was no sudden onset of a change because this girlfriend changed her title. There was no desire to get back with him. Even the findings were that the guardian ad litem in the first case did the analysis. She noted at factor eight, and the factor is the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the parent and the child. She says there is distinct hostility between the parties, which has impacted the children. In addition, it appears there are attempts to alienate the children, which have not been successful. So what is being complained of now, again, is what's been going on before. With the suggestion that there's suddenly been things that have changed or amped up, it's just not based on the record. The record doesn't show that all of a sudden things have been amped up. If change, if the standard was you were a little bit crazy before and you have to improve, the legislature would have told us that. But they didn't say that. They said we take it as a change in circumstance. So the baseline as established is the same as it is here. And that's what it was. The children, again, are functioning well. And that's what Noelte had told us, that there has to be an impact. So I disagree with what counsel suggests what goes on in these cases. I've been doing it for 37 years. Family cases are each individualized, but you get people with the worst part in their lives, and you are faced with just that little bit of insanity that we as uninvolved and disimpassionate advocates can say, oh, don't do that, that you shouldn't do that. But they live it every day, and the blessing is that the children aren't affected by it. They haven't been affected by this. Thank you. Thank you, sir. Thank you both for your briefs and your arguments. We're going to take this matter under advisement. We'll issue a written decision in due course. Thank you.